THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
Civil Action No. _____

| | |
|---|---|
| JEFFREY MCKEOWN,<br>    Plaintiff,<br><br>    vs.<br><br>TECTRAN MFG, INC,<br>    Defendant. | )<br>)<br>)<br>)    **COMPLAINT**<br>)<br>)<br>) |

NOW COMES Plaintiff, complaining of the acts of Defendant, and alleges and states the following:

**PARTIES, JURISDICTION, AND NATURE OF CLAIMS**

1. Plaintiff Jeffrey McKeown ("Plaintiff" or "Mr. McKeown") is a resident of Watauga County, North Carolina. Mr. McKeown maintains his personal home in Banner Elk, North Carolina and is domiciled there.

2. Plaintiff is a Canadian citizen who is lawfully admitted for permanent residence in the United States.

3. Defendant Tectran Mfg, Inc. ("Defendant" or "Tectran") is a corporation organized and existing under the laws of the State of Delaware.

4. Defendant is a corporate resident of Erie County, New York, as Tectran maintains its principal place of business in Erie County, New York.

5. Since 2009, Mr. McKeown worked in North Carolina as Director of OEM and Fleet for Tectran.

6. Mr. McKeown worked diligently for Tectran for many years, utilizing his Watauga County, North Carolina office as the headquarters for his Tectran business affairs.

7. Defendant conducts business in North Carolina and is registered as a foreign business with the North Carolina Secretary of State.

1

8. Plaintiff is entitled to compensation for his professional services from Tectran. The compensation owed to Mr. McKeown by Tectran includes stock options, vacation pay, and bonuses.

9. A dispute exists between Plaintiff and Defendant concerning the current status of Mr. McKeown's Tectran stock.

10. This Court holds jurisdiction over this controversy pursuant to 28 U.S.C. §1332(a), because there exists alienage jurisdiction between the citizen of a state and the citizen or subject of a foreign state.

11. This Court holds jurisdiction over this controversy pursuant to 28 U.S.C. §1332(a), because there exists complete diversity of citizenship between Plaintiff and Defendant.

12. The amount in controversy in this dispute exceeds $75,000.00, excluding interest and costs.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, or alternatively, because Defendant is subject to personal jurisdiction in this District.

## BACKGROUND FACTS

14. Plaintiff is a 28-year veteran of the heavy-duty truck and trailer component industry.

15. Mr. McKeown's professional experience includes a period working as the Director of Sales and Marketing for one of the largest and most respected parts distributors in the nation.

16. Similarly, Mr. McKeown developed a strong reputation associated with the sale of heavy duty OEM (original equipment manufacturer) products.

17. Defendant is a distributor and assembler of heavy duty truck and trailer components in the North America market. Tectran historically held a reputation as a purveyor of lower quality after-market parts.

18. OEM standards are much more stringent than the after-market standards Tectran historically employed.

19. In 2009, Tectran President Bruce McKie contacted Plaintiff and offered an ownership stake in Tectran. Following negotiations, Plaintiff agreed to join Defendant to develop Tectran's OEM business as employee and shareholder.

20. In regards to compensation, Tectran (via Bruce McKie) promised Mr. McKeown that he would not "go backwards" compared to his prior employer.

21. Tectran promised to provide an equity position in Tectran comparable to Mr. McKeown's equity position with his prior employer.

22. Defendant considered the promised Tectran shares as a primary source of funding for his retirement.

23. Mr. McKeown refused to enter into a non-compete agreement with Tectran. Tectran agreed.

24. Over a period of years, Tectran enjoyed significant revenue increases as a result of Mr. McKeown's professional efforts.

25. Despite Mr. McKeown's best efforts to develop an OEM quality brand, Tectran President Bruce McKie engaged in a pattern of problematic behavior concerning vehicle component quality, safety issues, and accounting.

26. For instance, Mr. McKeown brought $100,000+ of Department of Transportation brass fitting business to Tectran. After a few months of use, the customer discovered the brass was of inferior quality and did not meet applicable standards. Leaking air brakes can cause serious problems.

27. Plaintiff provided a detailed report of the defective nature to his Tectran superior President Bruce McKie. Bruce McKie chose not to address the defects in design in quality. Tectran lost the customer.

28. In another recent incident, an unproven hose design was launched and quickly developed several issues in the field. Bruce McKie represented to Tectran's counsel Kevin O'Connell that only seven filed incidents existed, when in reality more than double number had occurred.

29. Taken as a whole, Plaintiff concluded that Bruce McKie operated Tectran with repeated disregard for safety requirements and dialogue.

30. Tectran began to demonstrate a concerning lack as transparency.

31. For example, Bruce McKie floated the idea of a management buyout, whereby the majority ownership of Tectran would be replaced. The floated buyout placed the employees of Tectran in an uncomfortable and tenuous position.

32. On another occasion, Tectran (via Bruce McKie) set up an un-budgeted Kansas City sales office (including staff) and instructed Tectran employees not to disclose the new office to the Tectran majority owner.

33. In regards to financial accounting, Plaintiff believes that Tectran modified its financial records (by way of President Bruce McKie and the Tectran CFO) to a system of "cookie jar accounting".

34. Plaintiff believes that company financials are misrepresented on a monthly basis. It appears that the system involves inflating certain deposits (e.g., windfall from copper prices) in hopes of disguising unflattering expenses (e.g., $900,000.00 in unaccounted labor).

35. When it became clear that deception was increasing and Tectran was restricting open conversation about quality issues, Mr. McKeown became very concerned about his reputation in the industry and considered resigning.

36. The final straw came when Bruce McKie produced a technical report for FedEx Ground with fabricated details and mistruths related to a defective product matter.

37. Only days prior to issuance of the technical report, Plaintiff forwarded an e-mail message on February 13, 2017 to Tectran President Bruce McKie and Tectran counsel Kevin O'Connell stating in part as follows:

> *I want to be clear of what I know the risks to be. If shards of screen like in pictures 1, 3 and 4 make their way in to the Service side of the airbrake system,*

4

> *an O-ring could be cut and prevent that valve from delivering air to the service brakes. That simply means, the driver steps on the brakes and the trailer brakes don't come on for that unit, pushing the trailer ahead of it sideways or the truck in to a jackknife situation. If shards of the screen make it in to the Emergency system, the O-ring could be cut and prevent the parking brake from releasing. Or it could slice the O-ring just enough to prevent the 120psi from being held back, and hence the parking brake partially engages which drags the brake shoes and leads to a thermal event, typically resulting in fire.*

38. Despite Mr. McKeown's explicit warning, Tectran issued the falsified report and did not notify the NHTSA (National Highway Traffic Safety Administration).

39. Plaintiff resigned his employment with Defendant by way of a February 24, 2017 letter which provides as follows:

> *Dear Bruce:*
>
> *This letter is my formal notification that I am resigning from my position with Tectran as of the end of the business day, Friday February 24th.*
>
> *It's become painfully obvious to all that we've gone far beyond not sharing the same vision for what Tectran could become, to a completely dysfunctional relationship. These irreconcilable differences are hurting the company on a daily basis and so it's time for me to move on.*
>
> *At the core of it, our polar opposite views when it comes to business practices in relation to a "moral compass". The blatant mistruth of your FedEx letter of this week is just too much for me to accept. That coupled with the neglect to address my personal liability of the FedEx situation have resulted in an environment I no longer want to be a part of. And so, I'll exit the Tectran bus at this stop.*

> *I learned a lot, made a lot of good friends, sold a lot of parts and made the ownership a bunch of money. I left the place better off than when I came. I did my part.*
>
> *My laptop and Tectran property is on it's way back to Walden first thing Monday morning. For final logistics, please utilize my personal e-mail at jdmqn@icloud.com.*
>
> *Thanks. Jeff*

40. Plaintiff is but one of many Tectran employees who lost faith in Tectran management and left the company as part of a larger exodus.

41. Employees leaving Tectran within the last 12 months include 100% of the directors in sales and marketing, seven out of eight sales and marketing managers/directors, and the following departures: Director of Aftermarket Sales, Director of Marketing, Director of OEM and Fleet, Product Manager, California Sales Representative, Marketing Service Manager, Senior Account Manager, Eastern Regional Manager, Engineering Manager, Product Manager, and National Account Manager.

42. Plaintiff acted consistently and professionally throughout his tenure with and departure from Tectran.

43. Following Plaintiff's resignation, Tectran President Bruce McKie sent a e-mail message to Plaintiff on March 2, 2017 complimenting Mr. McKeown's "abilities, work ethic, professionalism and the like ... I've told many that you are the best truck parts sales guy I've ever known."

44. Plaintiff remained a Tectran shareholder following his resignation as an employee.

45. Despite the differences between Plaintiff and Bruce McKie, Plaintiff hoped that Tectran would proceed professionally and offer fair market value compensation for Mr. McKeown's Tectran shares, consistent with prior practices.

6

46. Tectran holds an established practice of re-purchasing former employee shares.

47. A January 22, 2015 e-mail message from Bruce McKie to Plaintiff (and others) confirms that Defendant repurchased Tectran from three former Tectran employees for $320.00/share in 2012 and 2015.

48. Rather than act consistently with prior practices and offer Plaintiff fair market value for Tectran shares, Tectran reversed course.

49. On April 28, 2017, Tectran's attorney sent correspondence which mischaracterized the underlying stock documentation and wrongfully claimed that Tectran could immediately repurchase Mr. McKeown's 600 Tectran shares for $71.45/share.

50. Tectran wrongfully mischaracterizes Plaintiff's resignation as "termination of employment by the Company".

51. On May 2, 2017, Plaintiff's attorney responded and disputed the legal validity of any purported closing involving Mr. McKeown's shares.

52. Tectran's attorney subsequently forwarded a check to Plaintiff in the amount of $42,870.00 (600 shares x $71.45). Plaintiff returned the wrongful check to Defendant.

53. Copies of Plaintiff's stock award documentation and attorney correspondence are attached as **Exhibits A and B**, respectively.

54. The fair market value of Plaintiff's Tectran shares now well exceeds the $320/share figure paid to former Tectran employees.

55. Despite repeated requests, Defendant refuses to offer fair market value for Mr. McKeown's Tectran shares and wrongfully claims that it has exercised a non-existing right to re-purchase.

56. Plaintiff remains the legal owner of Defendant's shares and is accordingly entitled to fair treatment as a Tectran shareholder.

57. Furthermore, Defendant wrongfully refuses to remit compensation owed to Plaintiff for his services to Tectran. Unpaid compensation owed by Defendant to Plaintiff includes $8,239.53 for unpaid vacation pay, approximately $16,000.00 for Plaintiff's unpaid quarterly bonus, and approximately $25,000.00 for Plaintiff's unpaid management bonus.

58. Based upon Defendant's actions, Plaintiff believes he is entitled to whistleblower protections and is initiating an administrative claim with the Occupational Safety and Health Administration.

59. Plaintiff requests that this Court adjudicate the legal status of Plaintiff's Tectran shares and compensation owed to Mr. McKeown for services rendered to Defendant.

## FIRST CLAIM FOR RELIEF
## (DECLARATORY JUDGMENT)

60. The allegations contained in the preceding paragraphs are hereby realleged and incorporated herein by reference.

61. As a result of the foregoing facts, as well as facts later to be proved at trial, there is an actual, justiciable controversy within this Court's jurisdiction between Plaintiff and Defendant relating to Plaintiff's status as a Tectran shareholder.

62. Plaintiff remains a Tectran shareholder until such time as Plaintiff accepts fair market compensation for his Tectran shares.

63. Defendant wrongfully claims that Tectran exercised an option to re-purchase Mr. McKeown's shares for significantly less than market value.

64. Pursuant to N.C. Gen. Stat. § 1-253 et seq. and 28 U.S.C. §§ 2201-2202, Plaintiff is entitled to a declaration identifying Mr. McKeown's status and associated rights as an active Tectran shareholder.

65. Pursuant to N.C. Gen. Stat. § 1-253 et seq. and 28 U.S.C. §§ 2201-2202, Plaintiff is entitled to a declaration detailing the parties rights associated with Plaintiff's Tectran shares.

66. A declaratory judgment in these circumstances would clarify and settle legal relations at issue.

67. A declaratory judgment would provide relief from the uncertainty, insecurity, and controversy surrounding Plaintiff's status as an active Tectran shareholder.

## SECOND CLAIM FOR RELIEF
## (NORTH CAROLINA WAGE AND HOUR ACT)

68. The allegations contained in the preceding paragraphs are hereby realleged and incorporated herein by reference.

69. Plaintiff worked for Defendant as a North Carolina employee.

70. Defendant violated the North Carolina Wage and Hour Act, N.C. Gen. Stat. § 95-25.1 et seq., when it refused to tender wages earned by its North Carolina employee, Mr. McKeown.

71. Plaintiff is owed unpaid "wages" (as defined in N.C. Gen. Stat. § 95-25.2(16)) from Defendant including $8,239.53 for unpaid vacation pay, approximately $16,000.00 for Plaintiff's unpaid quarterly bonus, plus approximately $25,000.00 for Plaintiff's unpaid management bonus, and wrongfully withheld Tectran shares.

72. Plaintiff violated the wage payment provisions of N.C. Gen. Stat. §§ 95-25.6 and 95-25.7 by failing to tender the wage payments owed to Plaintiff as required.

73. Pursuant to N.C. Gen. Stat. § 95-22.2, Plaintiff is entitled to recover damages from Defendant for unpaid wages owed, plus interest at the legal rate (8% APR) from the date each amount first came due, plus liquidated damages in an amount equal to the unpaid compensation, plus attorneys' fees.

74. Plaintiff demands to recover such liability from Defendant for unpaid wages along with any other recovery authorized by the North Carolina Wage and Hour Act.

## THIRD CLAIM FOR RELIEF
## (BREACH OF CONTRACT)

75. The allegations contained in the preceding paragraphs are hereby realleged and incorporated

herein by reference.

76. To hire Mr. McKeown, Tectran promised certain compensation, including but not limited to wages, bonuses, vacation pay, and a strong equity position as a Tectran shareholder.

77. In regards to overall compensation Defendant promised Plaintiff that he would not "go backwards" compared to his prior employer.

78. Tectran specifically promised to provide an equity position in Tectran comparable to Mr. McKeown's equity position with his prior employer.

79. Tectran promised to provide stock of equal value to replace stock at his former employer.

80. Tectran only delivered a small percentage of the promised Tectran ownership, and Mr. McKeown was wrongfully asked to pay $42,870.00 for those shares via personal funds.

81. Tectran only provided a fraction of equity ownership promised at the time of employment.

82. Defendant failed to provide the Tectran equity to which Plaintiff is entitled.

83. Defendant failed to properly administer 600 Tectran shares purchased on or about May 31, 2012

84. Defendant failed to provide Plaintiff with the additional Tectran shares promised at the initiation of employment.

85. Defendant failed to provide compensation owed to Plaintiff including unpaid bonuses, vacation pay, and grants of Tectran stock ownership.

86. A valid contract exists between the parties.

87. Defendant breached the terms of the parties' contract.

88. Defendant is liable to Plaintiff for the unpaid compensation owed to Plaintiff.

89. Plaintiff has complied with all conditions precedent and is entitled to receipt of payment from Defendant.

**PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF PRAYS THIS HONORABLE COURT FOR THE FOLLOWING

RELIEF:

1. That judgment be awarded Plaintiff against Defendant for an award of actual and compensatory damages well in excess of the jurisdictional threshold of $75,000.00 in a specific amount to be determined at trial, plus pre-judgment and post-judgment interest, to compensate Plaintiff for all monetary and/or economic harm.

2. That the Court award Plaintiff statutory remedies, including unpaid wages, liquidated damages, costs, fees, and attorneys' fees as provided by N.C. Gen. Stat. § 95-25.22.

3. That the Court award punitive damages as allowed by law in an amount to be determined by the Court sufficient to punish Defendant for their outrageous actions.

4. That Plaintiff recover its attorneys' fees.

5. That the Court enter a declaratory judgment identifying Mr. McKeown's status and associated rights as an active Tectran shareholder.

6. That the Court enter a declaratory judgment detailing the parties rights associated with Plaintiff's Tectran shares.

7. For a trial by jury.

8. That Plaintiff recover such other and further relief as the Court may deem appropriate.

## DEMAND FOR PUNITIVE DAMAGES

As described above, Defendant's actions were wanton, reckless, malicious and/or oppressive in character. Plaintiff demands the recovery of punitive damages.

## DEMAND FOR JURY TRIAL

The Plaintiff requests trial by jury.

This the 22nd day of June, 2017.

11

/S/ Chad J. Cochran
Chad J. Cochran, N.C. State Bar No. 35217
ccochran@hslc-law.com
Hannah Sheridan Loughridge & Cochran, LLP
Attorneys for Plaintiff
5400 Glenwood Ave., Suite 410
Raleigh, North Carolina 27612
Telephone: (919) 859-6840
Facsimile: (919) 859-6843

12

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# STATESVILLE DIVISION
## CASE NO. 17-CV-

| | |
|---|---|
| JEFFREY MCKEOWN, ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **VERIFICATION BY DECLARATION** |
| ) | |
| TECTRAN MFG, INC., ) | |
| Defendant. ) | |

I, Jeffrey McKeown, the above captioned Plaintiff, hereby state as follows:

1. My name is Jeffrey McKeown. I am a resident of Watauga County, North Carolina.

2. I am familiar with the facts from which this claim arises.

3. I have read the foregoing Complaint in full, and to my personal knowledge, information and belief, the matters and things stated therein are true, except as to such matters as are stated upon information and belief, and as to them, I am informed and believe that they are true.

I, Jeffrey McKeown, declare under penalty of perjury that the foregoing is true and correct. This verification is made as a written declaration pursuant to 28 U.S.C. § 1746.

Executed this the 22 day of June, 2017.

By: /s/ Jeffrey McKeown

1